# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LAVELL BONE,** | : | |
| **Plaintiffs** | : | **CIVIL ACTION NO. 3:19-0112** |
| **v.** | : | **(JUDGE MANNION)** |
| **WARDEN EBBERT, *et al.*,** | : | |
| **Defendants** | : | |

## MEMORANDUM

## I. Background

Plaintiff, an inmate formerly confined in the United States Penitentiary, Lewisburg, Pennsylvania[1], filed the above captioned Bivens[2] action. (Doc. 1). The action proceeds via an amended complaint. (Doc. 25). The named Defendants are Warden David J. Ebbert; Mid-level Provider Jessie Ayers; Lieutenant Matthew Saylor; Associate Warden Danon Colbert; Chief Psychologist Jennifer Enigk; Correctional Officer Edinger; Dr. Brockman; Dr. Eigenbrode and the United States. Id. Plaintiff alleges that staff fabricated an

---

[1] Plaintiff is currently housed in the United States Penitentiary, Coleman, Florida.

[2] Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). In Bivens, the Supreme Court created a limited federal tort counterpart to the remedy created by 42 U.S.C. §1983 as it applies to federal officers. A Bivens civil rights action under §1331 has the same standards as a §1983 civil rights action. See Paton v. La Prade, 524 F.2d 862, 871 (3d Cir. 1975).

incident report against him on July 16, 2018, resulting in his placement in excessively tight restraints and pain in his left wrist. Id. He also alleges that medical staff refused to treat his wrist pain, ignored his sick call requests, and would not give him proper medication for the pain. Id. Finally, Plaintiff claims that staff misdiagnosed his anxiety and refused to medicate him and his complaint to the Warden, Associate Warden and Chief Psychologist went unanswered. Id. For relief, Plaintiff seeks a transfer for medical and psychological treatment, as well as damages. Id.

Presently before the Court is Defendants' motion to dismiss and for summary judgment. (Doc. 29). The motion has been fully briefed and is ripe for disposition. For the reasons that follow, the Court will grant Defendants' motion to dismiss and for summary judgment.

## II. Standards of Review

### a. Summary Judgment

Federal Rule of Civil Procedure 56(a) requires the court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement

is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. Id. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 257; Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am., 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consol. Rail Corp., 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Electric Co., 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56 of identifying evidence which demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56 to go beyond his pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue.

Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986). When Rule 56 shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323. See Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992).

In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. White, 826 F.2d at 59. In doing so, the Court must accept the nonmovant's allegations as true and resolve any conflicts in his favor. Id. (citations omitted). However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted."

L.R. 56.1. A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he is a *pro se* litigant. These rules apply with equal force to all parties. See Sanders v. Beard, No. 09-CV-1384, 2010 WL 2853261, at *5 (M.D. Pa. July 20, 2010) (*pro se* parties "are not excused from complying with court orders and the local rules of court"); Thomas v. Norris, No. 02-CV-01854, 2006 WL 2590488, at *4 (M.D. Pa. Sept. 8, 2006) (*pro se* parties must follow the Federal Rules of Civil Procedure).

**b. Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1)**

Federal Rule of Civil Procedure 12(b)(1) authorizes the Court to dismiss an action for lack of subject matter jurisdiction. Motions brought under Rule 12(b)(1) may present either a facial or factual challenge to the Court's subject matter jurisdiction. Gould Elecs., Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000). In reviewing a facial challenge under Rule 12(b)(1), the standards associated with Rule 12(b)(6) are applicable. See id. In this regard, the Court must accept all factual allegations in the complaint as true, and the Court may consider only the complaint and documents referenced in or attached to the complaint. In a factual challenge to the Court's subject matter jurisdiction, the Court's analysis is not limited to the allegations of the complaint, and the presumption of truthfulness does not attach to the allegations. Mortensen v. First Fed. Sav. & Loan Ass'n, 549

F.2d 884, 891 (3d Cir. 1977). Instead, the Court may consider evidence outside the pleadings, including affidavits, depositions, and testimony, to resolve any factual issues bearing on jurisdiction. Gotha v. United States, 115 F.3d 176, 179 (3d Cir. 1997).

Once the Court's subject matter jurisdiction over a complaint is challenged, the plaintiff bears the burden of proving that jurisdiction exists. Mortensen, 549 F.2d at 891. If a dispute of material fact exists, "the [C]ourt must conduct a plenary hearing on the contested issues prior to determining jurisdiction." McCann v. Newman Irrevocable Tr., 458 F.3d 281, 290 (3d Cir. 2006); see also Berardi v. Swanson Mem'l Lodge No. 48, 920 F.2d 198, 200 (3d Cir. 1990) (stating that a district court must ensure that a plaintiff has "had an opportunity to present facts by affidavit or by deposition, or in an evidentiary hearing," to support his claim of jurisdiction (citation omitted)).

**c. Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6).**

Fed.R.Civ.P. 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." Under Rule 12(b)(6), we must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)(quoting Phillips v.

County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008)). While a complaint need only contain "a short and plain statement of the claim," Fed.R.Civ.P. 8(a)(2), and detailed factual allegations are not required, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Id. at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662 (2009) (quoting Twombly, 550 U.S. at 556). "[L]abels and conclusions" are not enough, Twombly, 550 U.S. at 555, and a court "is not bound to accept as true a legal conclusion couched as a factual allegation." Id. (quoted case omitted). Thus, "a judicial conspiracy claim must include at least a discernible factual basis to survive a Rule 12(b)(6) dismissal." Capogrosso v. The Supreme Court of New Jersey, 588 F.3d 180, 184 (3d Cir. 2009) (*per curiam*).

In resolving the motion to dismiss, we thus "conduct a two-part analysis." Fowler, supra, 578 F.3d at 210. First, we separate the factual elements from the legal elements and disregard the legal conclusions. Id. at 210-11. Second, we "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief"." Id. at 211 (quoted case omitted).

### III.     Statement of Undisputed Facts[3]

On July 9, 2018, Plaintiff, Lavell Bone (Bone), was transferred to the Special Management Unit (SMU) at the USP-Lewisburg. (Doc. 48-1). Public Information Inmate Data).

On July 13, 2018, Bone met with Dr. Edinger regarding his fourteen (14) Day Physician Evaluation Encounter. (Doc. 48-1 at 234, Clinical Encounter). They discussed Bone's chronic conditions and medications. Id. Dr. Edinger specifically noted Bone's lack of an active mental health diagnosis. Id. Although Bone reported hearing voices telling him to do things, he could not elaborate on any further psychotic symptomology when pressed. Id. Dr. Edinger noted that Bone denied suffering from panic attacks

---

[3] The Local Rules of Court provide that in addition to filing a brief in opposition to the moving party's brief in support of its motion, "[t]he papers opposing a motion for summary judgment shall include a separate, short and concise statement of material facts responding to the numbered paragraphs set forth in the statement [of material facts filed by the moving party]...as to which it is contended that there exists a genuine issue to be tried." M.D. Pa. L.R. 56. 1. The Rule further requires the inclusion of references to the parts of the record that support the statements. Id. Finally, the Rule states that the statement of material facts required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party. See id. Unless otherwise noted, the factual background herein is taken from Defendants' Rule 56.1 statement of material facts. (Doc. 48). Plaintiff did not file a response to Defendants' statement of facts in compliance with M.D. Pa. L.R. 56.1 or a statement of material facts to support his own motion for summary judgment. Thus, the Court deems the facts set forth by Defendants to be undisputed. See M.D. Pa. LR 56. 1; Fed. R. Civ. P. 56(e)(2).

during his initial assessment and that his complaints of physical pain do not clinically correlate to Plaintiff's alleged anxiety. Id. A review of Bone's medical record indicates repeated, self-inflicted wounds to his left wrist and forearm. (Doc. 48-1 at 239, Bureau Electronic Medical Record ("BEMR") excerpts from 2018). Bone previously reported pain and tingling in his left wrist while admitting to cutting his forearm. Id.

On July 16, 2018, at approximately 7:10 pm, Lt. Shirk issued Plaintiff Incident Report Number 3146631 for threatening another with bodily harm, in violation of Code 203 and refusing an order, violation of Code 307. (Doc. 48-1 at 14, Incident Report). Specifically, the misconduct charged Plaintiff as follows:

> On Monday, July 16, 2018, at approximately 7:10pm, Inmate Bone, Lavell #60154-019 refused to submit to hand restraints so that an incoming off the bus could enter cell G-324. Specifically, inmate Bone refused my orders to submit to hand restraints in order for a cellmate assignment to enter his cell. At this time, inmate Bone got agitated and stated, "I am not taking a cellmate! I will hog tie them and fuck them up if you put anyone in here with me. Check my history. I am not playing! By stating this, it demonstrates that inmate Bone was threatening bodily harm to another individual and refused staff orders to submit to hand restraints.

Id. Due to inmate Bone refusing staff's orders, displaying signs of imminent violence, showing he was not in control of himself physically or emotionally,

and a documented STG assignment of having a history of defeating restraints, the Warden was notified and authorized a Use of Force Team[4] to be assembled in order to place inmate Bone into four-point restraints. (Doc. 48-1 at 10, Form 583 Report of Incident).

At approximately 7:58 p.m., a Use of Force Team was assembled, and confrontation avoidance procedures were initiated with positive results. (Doc. 48-1 at 12, Report of Incident and Doc. 48-1 at 27, Video submitted under Seal). Inmate Bone submitted to hand restraints, was removed from the cell, and placed into leg restraints. Id. He was then escorted to J-Block, cell #327, where he was visually searched, metal detector searched, photographed, placed into new clothes and placed into 4-point restraints at approximately 8:19 p.m. Id. After the restraints were applied, Defendant (Lieutenant) Saylor and medical staff checked the restraints and determined them to be properly applied. Id. Inmate Bone was medically assessed and sustained no injuries. Id. Inmate Bone was to remain in four-point restraints until he demonstrates a pattern of non-disruptive behavior. Id. Inmate Bone was tested via the

---

[4]BOP Program Statement 5566.06, Use of Force, governs the applications of restraints. (Doc. 48-1 at 209, BOP Program Statement 5566.06, Use of Force). Staff is authorized to apply physical restraints necessary to gain control of an inmate who appears to be dangerous because the inmate assaults another individual, becomes violent, or displays signs of imminent violence. Id. When the situation is warranted, the warden may approve more restrictive or secure restraints (i.e., when less restrictive restraints have proved to be ineffective previously). Id.

passive breathalyzer system with negative results. Id. No staff injuries were reported. Id.

Following this incident and calculated use of force, at approximately 8:00 pm, Incident Report Number 3146631 was served on Bone charging him with Threatening Another with Bodily Harm and Refusing an Order. (Doc. 48-1 at 14).

While an inmate is in restraints, staff must observe the inmate's behavior over a period of time to look for patterns of non-disruptive behavior as an indication that the inmate has regained self-control and is no longer a disruptive threat. (Doc. 48-1 at 209, BOP Program Statement 5566.06, Use of Force). Based on staff's assessment, the inmate can be removed from the restraints, continue to remain in restraints, or be placed in progressively more or less restrictive restraints. Id. Correctional staff must assess the inmate and log their observations every fifteen (15) minutes. Id. Bone's fifteen-minute restraint checks were completed in accordance with BOP policy from 8:19 p.m. on July 16, 2018 until 12:45 p.m. on July 17, 2018. (Doc. 48-1 at 15, Fifteen Minute Restraints Check Form (24-Hours)). During the fifteen-minute restraint checks, Bone had his eyes closed, was staring at the ceiling or wall, looking out the window, twisting, pulling or manipulating his restraints, being belligerent toward staff, refusing to acknowledge staff, and

smiling and winking. Id. He made no complaints to correctional staff that his restraints were too tight. Id.

In addition to the fifteen-minute restraints, while an inmate is in restraints, a lieutenant must also assess the inmate and log his observations every two (2) hours. (Doc. 48-1 at 209, BOP Program Statement 5566.06, Use of Force). In Bone's case, records reveal that two-hour checks were completed in accordance with BOP policy. (Doc. 48-1 at 57, Two-Hour Lieutenant Restraints Check Form (24-Hours)). Lieutenants checked on Bone's restraints at 10:00 p.m. on July 16, 2018, and at 12:00 a.m., 2:00 a.m., 4:00 a.m., 6:00 a.m., 8:00 a.m., 10:00 a.m., 12:00 p.m., and at 12:45 p.m. on July 17, 2018, when the restraints were removed. Id. Defendant Saylor was the lieutenant for the use of force team which placed Bone in four-point restraints following his disruptive behavior. (Doc. 48-1 at 12, Report of Incident and Doc. 48-1 at 27, Video submitted under Seal). After the restraints were applied, Lieutenant Saylor and medical staff checked the restraints and determined them to be properly applied. Id. Lieutenant Saylor performed four (4) other lieutenant checks on Bone while he was in restraints, at 10:00 p.m. on July 16, 2018, and at 8:00 a.m., 10:00 a.m., 12:00 p.m. and 12:45 p.m. on July 17, 2018. (Doc. 48-1 at 57). Each time Lieutenant Saylor checked the restraints, he found the restraints were properly placed. Id. While in restraints, Bone maintained a poor attitude by

either refusing to communicate with staff or telling staff when they offered to remove his restraints at 12:01 a.m. on July 17, 2018, "I can do this all day" until he started to show "signs of calm behavior" at 12:00 p.m. on July 17, 2018. Id. Bone was downgraded to ambulatory restraints at 9:00 a.m. on July 17, 2018, and removed from those restraints by Lieutenant Saylor at 12:45 p.m. Id. There are no complaints in the Two-Hour Lieutenant Restraints Check that the restraints were applied inappropriately or too tightly. Id.

While an inmate is in restraints, Health Services staff is required to check the inmate's restraints twice during each eight (8) hour shift. (Doc. 48-1 at 209, BOP Program Statement 5566.06, Use of Force). While an inmate is in restraints, Psychology staff is required to check the inmate every twenty-four (24) hours until the inmate's restraints have been removed. Id. Medical personnel were present when the restraints were initially placed on Bone and Bone was medically assessed. (Doc. 48-1 at 12, Report of Incident and Doc. 48-1 at 27, Video submitted under Seal). The initial health services restraint check was conducted at 8:19 p.m. during which time it was noted that Bone had no injuries and he was educated about the dangers of manipulating his restraints. (Doc. 48-1 at 21, Health Services Restraint Review Form (24-Hours)). His right wrist restraint was adjusted. Id. Otherwise, the restraints moved freely with no circulatory compromise and Bone made no complaints. Id. At 12:01 a.m. on July 17, 2018, the health services restraint check

revealed that Bone had no injuries, he refused to use the toilet, he drank eight (8) ounces of water, and the overall assessment of Bone's health was "fine." Id. The next health services restraint check was conducted at 6:00 a.m. by Defendant (Physician Assistant). (Doc. 48-1 at 62, Clinical Encounter). PA Ayers indicated that Bone had no complaints, was offered a meal, water, and the restroom, his breathing and circulation were not compromised, and that the PA was able to place her finger between Bone's skin and the restraints. Id. Bone did not appear to be in distress. Id. The last health services restraint check was conducted at 12:00 p.m. on July 17, 2018. (Doc. 48-1 at 22). The 12:00 p.m. restraint check indicates that Bone had no injuries, had food and drink available, he was able to use the toilet as needed, he was educated on the manipulation of restraints, and his overall health was assessed as being within normal limits. Id.

At 7:59 a.m. on July 17, 2018, Defendant (Psychologist) Enigk conducted a psychology restraint check. (Doc. 48-1 at 23, Psychology Services Restraint Review Form (24-Hours). Bone denied any current concern or need for increased support from psychology. Id. There were no apparent symptoms of depression, anxiety, psychosis, suicidality, or acute emotional distress. Id. Defendant Enigk recommended that Bone comply with policy and staff's lawful request. Id. Bone verbalized his understanding of Defendant Enigk's recommendation. Id.

- 14 -

Bone was kept in four-point restraints from 8:19 p.m. on July 16, 2018 until 9:00 a.m. on July 17, 2018, when he was placed in ambulatory restraints. (Doc. 48-1 at 15, Fifteen Minute Restraints Check Form). He was removed from ambulatory restraints at 12:45 p.m. on July 17, 2018. Id. Once ambulatory restraints were removed, the Warden issued an After Action Review, which determined that "the actions taken with respect to the use of force and/or restraints were reasonable and appropriate and have been reviewed with staff involved." (Doc. 48-1 at 25, After Action Review).

On August 6, 2018, a disciplinary hearing was conducted regarding Incident Report Number 314663, issued as a result of the July 16, 2018 incident. (Doc. 48-1 at 34). Bone was found guilty of committing the prohibited acts of Threatening Bodily Harm and Refusing to Obey an Order as alleged. Id. Bone was sanctioned to twenty-seven (27) days loss of good conduct time, thirty (30) days in disciplinary segregation and ninety (90) days loss of telephone privileges for the Code 203, Threatening Bodily Harm, violation. Id. Bone was sanctioned to ninety (90) days loss of visitation privileges for the Code 307, Refusing to Obey an Order, violation. Id. The incident report remains on Bone's disciplinary record and was never expunged. Id.

On September 12, 2018, Bone was seen by PA Ayers for upper extremity pain. (Doc. 48-1 at 266, Clinical Encounter). Specifically, Bone

- 15 -

complained of sharp pains in his left wrist and numbness in his hand. Id. He states this started after he "was put into restraints for a while." Id. It was noted that Bone has not tried anything for the pain and states that certain movements/positions tend to make it worse. Id. PA Ayers advised him to try a non-steroidal inflammatory ("NSAID") from the commissary for any discomfort and provided him range of motion exercises for carpal tunnel syndrome to see if his symptoms improved. Id.

On October 24, 2018, PA Craig saw Bone again for claims of pain and numbness in his left wrist and hand. (Doc. 48-1 at 268, Clinical Encounter). He reported trying over the counter ("OTC") medication with no improvement. Id. Staff ordered an electromyography ("EMG") test to rule out carpal tunnel syndrome. Id.

On October 31, 2018, Bone submitted an indigent request for OTC medication. (Doc. 48-1 at 270, OTC Medication Request). His request was denied as he had funds in his commissary account and was not indigent. Id.

On November 1, 2018, Bone was seen by a specialist from the Pennsylvania Institute of Neurology regarding his left wrist pain. (Doc. 48-1 at 271, Note from Dr. Hasan Askari dated November 1, 2018). The EMG showed mild neuropathy suggestive of a local injury to the nerve. Id. The recommended course of treatment was continued symptomatic care. Id.

On November 16, 2018, medical staff responded to an attempted suicide by Bone. (Doc. 48-1 at 278, Clinical Encounter dated November 16, 2018). Bone indicated he swallowed 20 pills because his anxiety was causing him pain. Id. He could not specify any particular pain or location, but wanted additional medication prescribed to him. Id. Psychology staff was advised. Id.

On November 27, 2018, Bone requested pain medication he alleged the nerve doctor told him he would receive. (Doc. 48-1 at 279, Administrative Note dated November 27, 2018). PA Ayers reiterated the EMG results showed a localized injury, for which he was to try OTC pain medication but had not done so. Id. Bone was again encouraged to try OTC medication and give the injury time to heal. Id.

On December 19, 2018, Bone again inquired about pain medication on December 19, 2018, and became verbally aggressive and threatening during the encounter with PA Ayers. (Doc. 48-1 at 282, Administrative Note dated December 19, 2018). A review of Bone's records indicated he had not yet purchased any OTC pain medication from the commissary. Id. Due to Bone's behavior, PA Ayers terminated the encounter. Id.

On January 2, 2019, Bone had inmate requests to staff forms stuck in his door. (Doc. 48-1 at 68, Clinical Encounter Administrative Note dated January 2, 2019). As PA Ayers attempted to approach Bone's door to

discuss his issues, Bone began screaming and yelling profanities at PA Ayers. Id. PA Ayers left the forms and terminated the encounter due to being unable to safely approach Bone's cell door. Id.

Bone was seen again on January 8, 2019, for complaints of left wrist pain. (Doc. 48-1 at 283, Clinical Encounter dated January 8, 2019). He was noted to have finally purchased aspirin from commissary, but it was unknown if he had taken any of it. Id. Staff prescribed him a five-day round of prednisone and advised him to continue treatment with OTC medications. Id.

On January 16, 2019, Bone again complained of left wrist pain and was prescribed Ibuprofen as well as treated with five days of steroid. (Doc. 48-1 at 285, Clinical Encounter dated January 16, 2019).

During a cell search on January 24, 2019, multiple medications were confiscated from Bone's cell. (Doc. 48-1 at 287, Administrative Note dated January 24, 2019). Included were nine prednisone tablets and eighteen Ibuprofen tablets, indicating he was not taking the medication as prescribed. Id.

On February 1, 2019, Dr. Edinger evaluated Bone, where he complained of nerve pain in his left wrist. (Doc. 48-1 at 288, Clinical Encounter dated February I, 2019). Dr. Edinger determined Bone's description was more akin to a tendon injury known as De Quervain's

Tenosynovitis and provided him a splint and advised him to wear it continuously for six weeks. Id.

On February 27, 2019, PA Ayers entered a note in Bone's chart that he continued to complain of thumb and wrist pain, for which he was given a brace by Dr. Edinger. (Doc. 48-1 at 69, Administrative Note dated February 27, 2019). As of February 27, 2019, Bone had yet to be observed wearing the splint throughout the day. Id. PA Ayers encouraged Bone to be compliant with the brace and wear it consistently for the next four weeks to see if there is improvement. Id.

On March 26, 2019, medical staff again saw Bone for complaints of left wrist pain. (Doc. 48-1 at 291, Clinical Encounter dated March 26, 2019). Staff indicated he had been in restraints a number of times for engaging in disruptive behavior, approximately seven times since his arrival to USP-Lewisburg in July 2018. Id. That frequency does not allow sufficient time for the nerve injury to heal. Id. He also had sporadic use of OTC anti-inflammatories. Id. Medical staff advised him to continue OTC medication and avoid behavior placing him in restraints. Id.

The Bureau of Prisons (BOP) has a multi-tiered administrative remedy program with the stated purpose of "allow[ing] an inmate to seek formal review of an issue relating to any aspect of his/her own confinement." 28 C.F.R. §542.10 et seq. Inmates must first informally present their complaint

to staff in an attempt to resolve the matter. 28 C.F.R. §542.13(a). If informal

resolution is not successful, the inmate then presents the issue to the warden

within twenty (20) calendar days following the events giving rise to the

complaint. 28 C.F.R. §542.14. The Warden has twenty (20) days to respond

to the inmate's complaint. 28 C.F.R. §542.18. In the event the inmate is

dissatisfied with the warden's response, he may file an appeal to the

Regional Director "within 20 calendar days of the date the Warden signed

the response." 28 C.F.R. §542.15(a). If the response of the Regional Director

is not satisfactory to the inmate, the inmate may then appeal within thirty (30)

calendar days to the BOP's Central Office, which is the final administrative

appeal. Id. If an inmate "does not receive a response within the time allotted

for reply, including extension, the inmate may consider the absence of a

response to be a denial at that level." 28 C.F.R. §542.18. If a remedy is

rejected, it is returned to the inmate and the inmate is provided with a written

notice explaining the reason for a rejection. 28 C.F.R. §542.17(a), (b). An

administrative remedy is deemed exhausted only when it has been denied

by the Central Office.

BOP records show that Bone filed a total of one hundred ninety-four

(194) administrative remedies while he has been in BOP custody. (Doc. 48-

1 at 170, Administrative Remedy Generalized Retrieval). During the time

period of July 9, 2018, when Bone arrived at USP-Lewisburg, to January 17,

2019, when Bone filed his complaint, Bone filed forty-six (46) administrative remedies. Id. Of those forty-six (46) administrative remedies, Bone only exhausted six (6) remedies through the Central Office level. Id. The six remedies and their respective "abstract" descriptions noted in the Administrative Remedy Generalized Retrieval report is as follows:

- Remedy 952753, "claims staff ignored his suicidal warning"
- Remedy 954580, "staff used profane language with him"
- Remedy 954575, "alleges counselor did not give him 2 BP8 responses"
- Remedy 954728, "alleges med staff aren't documenting in his records"
- Remedy 954766, "DHO appeal"
- Remedy 954768, "DHO appeal"

Id.

## IV. Discussion

### A. Bivens Claim - Excessive Force

No federal statute authorizes federal courts to hear suits against federal officers who violate the Constitution. However, the Supreme Court has inferred a narrow cause of action against federal officers for damages directly from the text of the Constitution. Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971) (Fourth Amendment violation related to warrantless search and seizure); Carlson v. Green, 446 U.S. 14 (1980) (Eighth Amendment violation related to a prison

officials' denial of medical care); Davis v. Passman, 442 U.S. 228 (1979) (Fifth Amendment due process clause violation based on discrimination on the basis of sex in federal employment).

Under Bivens, the District Court has federal question jurisdiction pursuant to 28 U.S.C. §1331 to entertain an action brought to redress alleged federal constitutional or statutory violations by a federal actor. Bivens, supra. Pursuant to Bivens, "a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal question jurisdiction of the district court to obtain an award of monetary damages against the responsible federal official." Butz v. Economou, 438 U.S. 478, 504 (1978). A Bivens-style civil rights claim is the federal equivalent of an action brought pursuant to 42 U.S.C. §1983 and the same legal principles have been held to apply. See Paton v. LaPrade, 524 F.2d 862, 871 (3d Cir. 1975); Veteto v. Miller, 829 F.Supp. 1486, 1492 (M.D. Pa. 1992); Young v. Keohane, 809 F.Supp. 1185, 1200 n. 16 (M.D. Pa. 1992). In order to state an actionable Bivens claim, a plaintiff must allege that a person has deprived him of a federal right, and that the person who caused the deprivation acted under color of federal law. See West v. Atkins, 487 U.S. 42, 48 (1988); Young v. Keohane, 809 F.Supp. 1185, 1199 (M.D. Pa. 1992).

It is not enough that a plaintiff allege he suffered a violation of the same general right as one of the three recognized grounds for a Bivens claim. The

Supreme Court has held that it will not expand the Bivens cause of action to contexts that are "different in a meaningful way from previous Bivens cases" decided by the Court. Hernandez v. Mesa, 140 S. Ct. 735, 743 (2020) (quoting Ziglar v. Abbasi, 137 S. Ct. 1843, 1859 (2017)). As a result, in order to have a cognizable Bivens claim, a plaintiff must allege that his claim is both factually and legally similar to Bivens claims previously decided by the Supreme Court. Id. at 743. If the claim presents a new context, courts should then apply a "special factors" analysis to determine whether "special factors counsel hesitation" in expanding Bivens, absent affirmative action by Congress. Abbasi, 137 S. Ct. at 1857, 1876 (citation omitted).

In the matter *sub judice*, Bone seeks damages for Defendants alleged used excessive force against him in violation of his Eighth Amendment rights. He asserts that the BOP defendants fabricated an incident report and restraint checks in order to justify his placement and continuation in restraints. The Third Circuit has found a comparable claim to constitute an expansion of Bivens into a new context, and this court agrees. Bistrian v. Levi, 912 F.3d 79, 94 (3d Cir. 2018) ("[T]he punitive-detention claim does amount to an extension of Bivens into a new context."). In Abbasi, the Supreme Court concluded that "expanding the Bivens remedy is now a disfavored judicial activity," noting that it has "consistently refused to extend Bivens to any new context or new category of defendants." 137 S. Ct. at 1857

- 23 -

(citations omitted). Consideration of special factors counseling against extension of <u>Bivens</u> must be undertaken. "[T]he inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." <u>Id.</u> at 1857-58. Under <u>Abbasi</u>, "any alternative, existing process for protecting the [plaintiff's] interest[s]" is a compelling reason to "refrain" from extending a <u>Bivens</u> remedy. <u>Id.</u> at 1858 (citations omitted).

The Third Circuit's discussion of the special factors to be weighed when considering whether to extend the <u>Bivens</u> remedy to a claim for punitive detention is compelling:

> [A] punitive-detention claim more fully calls in question broad policies pertaining to the reasoning, manner, and extent of prison discipline. The warden and other prison officials have—and indeed must have—the authority to determine detention policies, to assess the endless variety of circumstances in which those policies may be implicated, and to decide when administrative detention is deserved and for how long. <u>See</u> <u>Sandin v. Conner,</u> <u>515 U.S. 472, 482, 115 S. Ct. 2293, 132 L.Ed.2d 418 (1995)</u> (observing, in the §1983 context, that "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile [prison] environment" and thus should limit "the involvement of federal courts in the day-to-day management of prisons"). Detention policies and their application cannot be helpfully reviewed as <u>Bivens</u> claims. "[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform" because the problems "are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree." <u>Turner v. Safley,</u> <u>482 U.S. 78, 84, 107 S. Ct. 2254, 96 L.Ed.2d 64 (1987)</u> (citation omitted).

The Bureau of Prisons, not the judiciary, has the "expertise, planning, and the commitment of resources" necessary for the difficult task of running a correctional facility. Id. at 84-85, 107 S.Ct. 2254. Consequently, the task of prison administration "has been committed to the responsibility of [the legislative and executive] branches, and separation-of-powers concerns counsel a policy of judicial restraint." Id. at 85, 107 S. Ct. 2254. Ruling on administrative detention policy matters would unduly encroach on the executive's domain. See Wetzel v. Edwards, 635 F.2d 283, 288 (4th Cir. 1980) ("It is a rule grounded in necessity and common sense, as well as authority, that the maintenance of discipline in a prison is an executive function with which the judicial branch ordinarily will not interfere." (citation omitted)).

Besides those serious separation of powers concerns, recognizing a Bivens remedy would likely cause "an increase of suits by inmates, increased litigation costs to the government, and ... burdens on individual prison employees to defend such claims." ... Heeding the reasoning in Abbasi, we must be reluctant to "establish whole categories of cases in which federal officers must defend against personal liability claims in the complex sphere of litigation." 137 S. Ct. at 1858 .... [The] punitive-detention claim ... is not a valid Bivens action.

Bistrian, 912 F.3d at 94–95 (footnotes omitted); see also Earle v. Shreves, 990 F.3d 774, 780–81 (4th Cir. 2021) (addressing a claim that a plaintiff had been placed in the SHU in retaliation, the Fourth Circuit cited the Third Circuit's analysis of the special factors with approval). Thus, no further discussion is required. The Bistrian decision is on point and persuasive. Adopting the Third Circuit's reasoning, this Court joins the many others that

have concluded,[5] that extending Bivens to Bone's Eighth Amendment excessive confinement in restraints claim would be contrary to law. Consequently, we find that Plaintiff's Eighth Amendment excessive force claim should be dismissed under Rule 12(b)(6) for failure to state a claim.

## B. Defendant Enigk entitled to Statutory Immunity

Bone sets forth claims against Chief Psychologist Enigk, claiming that she failed to properly treat him for an alleged panic/anxiety disorder. (Doc. 25). Defendant Enigk is a commissioned officer and member of the United

---

[5] See, e.g., Mammana v. Barben, No. 20-2364, 2021 WL 2026847, at *4 (3d Cir. May 21, 2021) (footnote omitted) (plaintiff alleging Eighth Amendment violation for confinement for four days "in a chilled room with constant lighting, no bedding, and only paper-like clothing" did not state a Bivens claim, with the Third Circuit noting plaintiff "asks for a new implied cause of action to sue federal prison officials for unconstitutional conditions of confinement, a step never taken by the Supreme Court nor any circuit court"); Hill v. Lappin, No. 3:11-cv-1609, 2021 WL 2222725, *3 (M.D. Pa. June 2, 2021) (noting that although the courts "in the wake of Abbasi" initially did not sua sponte consider whether conditions-of-confinement claims remained viable, "[a]s the dust settles, however, and courts began to appreciate Abbasi's watershed scope, the better-reasoned authority has declined to recognize a Bivens remedy for Eighth Amendment conditions-of-confinement…claims."); Brown v. Nash, No. 3:18-CV-528, 2019 WL 7562785, at *4-6 (S.D. Miss. Dec. 13, 2019) (concluding that Bivens did not extend to inmate's Eighth Amendment claim of excessive force, noting, inter alia, that concerns of institutional security counseled hesitation), report and recommendation adopted, 2020 WL 129101 (Jan. 10, 2020); Hunt v. Matevousian, 336 F. Supp. 3d 1159, 1169-70 (E.D. Cal. Oct. 1, 2018) (declining to extend Bivens to inmate's Eighth Amendment claim of excessive force, noting that "Congress has been active in the area of prisoners' rights, and its actions do not support the creation of a new Bivens claim").

States Public Health Service and was assigned to USP-Lewisburg as the Chief Psychologist. (Doc. 48 at ¶ 7). Under the Public Health Service Act, the exclusive remedy for personal injury damages resulting from the performance of medical functions by any officer or employee of the Public Health Service while acting within the scope of their office or employment is a suit against the United States pursuant to the FTCA. See 42 U.S.C. §233(a). Section 233(a) thus "grants absolute immunity to [Public Health Service] officers and employees for actions arising out of the performance of medical or related functions within the scope of their employment by barring all actions against them for such conduct." Hui v. Castaneda, 559 U.S. 799, 806 (2010). Thus, the Public Health Service Act precludes suit against Chief Psychologist Enigk, and she is entitled to dismissal from this action. See Anderson v. Bureau of Prisons, 176 F. App'x. 242, 243 (3d Cir. 2006).

## C. Favorable Termination Rule

Bone asserts that the incident report issued against him on July 16, 2018 was falsified and resulted in his placement in restraints, in violation of the Eighth Amendment. In response, Defendants argue that Bone's Eighth Amendment claim is barred by the favorable termination rule in Heck v. Humphrey, 512 U.S. 477 (1994). In Heck, the Supreme Court ruled that a constitutional cause of action for damages does not accrue "for allegedly unconstitutional conviction or imprisonment, or for other harm caused by

actions whose unlawfulness would render a conviction or sentence invalid," until the plaintiff proves that the "conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." Id. at 486-8.

In Edwards v. Balisok, 520 U.S. 641 (1997), the Supreme Court extended the rationale in Heck to disciplinary proceedings, holding that the expungement of the inmate disciplinary proceeding would imply the invalidity of the underlying disciplinary action: "[t]he principal procedural defect complained of by the respondent would, if established, necessarily imply the invalidity of the deprivation of his good-time credits." Edwards, 520 U.S. at 646. Accordingly, an inmate may not bring a civil rights action for declaratory and injunctive relief related to an inmate disciplinary proceeding without first challenging and overturning, via appropriate proceedings, the disciplinary hearing in question. Id. at 646-47.

Here, an award of damages would implicate the validity of the underlying disciplinary proceedings. Bone cannot assert such a claim unless he can demonstrate that the DHO's decision regarding the misconduct was invalidated on administrative appeal or through issuance of a writ of habeas corpus. There is no evidence that the DHO's decision was invalidated through the BOP's administrative remedy review system. Further, there is no

indication that a petition for writ of habeas corpus challenging the validity of the misconduct proceedings was ever pursued or resolved favorably to Bone. Thus, because the disciplinary proceedings have not been determined unlawful, it is appropriate to dismiss this claim pursuant to Heck and Edwards.

### D. **Bivens-Eighth Amendment Deliberate Indifference to Medical Care**

As is relevant in the present case, the United States Supreme Court has specifically allowed Bivens claims to be brought against federal prison officials based on an allegation of deliberate indifference to a serious medical need. See Carlson v. Green, 446 U.S. 14 (1980) (holding that prisoner's estate had a Bivens remedy against federal jailers for failure to treat his asthma under the Eighth Amendment). Here, Bone alleges that excessively tight restraints caused his wrist pain and Defendants were indifferent to the treatment of his pain.

In order to establish an Eighth Amendment medical claim, a plaintiff must show "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." Natale v. Camden Cty. Correctional Facility, 318 F.3d 575, 582 (3d Cir. 2003). See also Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999). A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that

is so obvious that a layperson would recognize the need for a doctor's attention. Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987). In addition, "if unnecessary and wanton infliction of pain results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the eighth amendment." Id.

A prison official acts with deliberate indifference to an inmate's serious medical needs when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). Thus, a complaint that a physician or a medical department "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment ..." Estelle v. Gamble, 429 U.S. 97, 106 (1976). For instance, a "medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice." Id., 429 U.S. at 107. "[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990). Further, a doctor's disagreement with the professional judgment of another doctor is not

actionable under the Eighth Amendment. See White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990). In sum, negligence, unsuccessful medical treatment, or medical malpractice does not give rise to a §1983 cause of action, and an inmate's disagreement with medical treatment is insufficient to establish deliberate indifference. See Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993).

Further, a prison administrator cannot be found deliberately indifferent under the Eighth Amendment because he or she fails to respond to the medical complaints of an inmate being treated by a prison physician, or because, as non-physicians, they defer to the medical judgment of the inmate's treating physicians. Id., 991 F.2d at 69. If, however, non-medical prison personnel had "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner," liability may be imposed. Spruill, 372 F.3d 236.

A mere difference of opinion between the prison's medical staff and the inmate regarding the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment. Farmer v. Carlson, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988). See McCracken v. Jones, 562 F.2d 22, 24 (10th Cir. 1977); Smart v. Villar, 547 F.2d 112, 113 (10th Cir. 1976).

Additionally, if there is a dispute over the adequacy of the received treatment, courts have consistently been reluctant to second guess the medical judgment of the attending physician. Little v. Lycoming County, 912 F. Supp. 809, 815 (M.D. Pa.), aff'd, 101 F.3d 691 (3d Cir. 1996). The key question is whether the defendant has provided the plaintiff with some type of treatment, regardless of whether it is what the plaintiff desires. Farmer v. Carlson, 685 F. Supp. at 1339.

Assuming, without deciding, that Plaintiff's medical need was serious in the constitutional sense, the record evidence more than amply demonstrates that Plaintiff received medical attention, and that the attention Plaintiff received lacks the requisite deliberate indifference to support a Section 1983 claim.

Initially, the Court notes that Plaintiff's medical record reviewed on July 13, 2018, within two weeks of his transfer to USP-Lewisburg, revealed that Plaintiff had previously complained of pain and numbness as a result of several self-inflicted injuries to his left wrist and forearm.

Bone first complained of left wrist pain at USP-Lewisburg on September 12, 2018, during an encounter with PA Ayers. She advised him to try a non-steroidal inflammatory from the commissary for any discomfort and provided him range of motion exercises for carpal tunnel syndrome to see if his symptoms improved. When he again complained of wrist pain on

October 24, 2018, staff ordered an EMG to determine the cause. The EMG showed mild neuropathy suggestive of a local injury to the nerve with the recommended course of treatment as continued symptomatic care.

As Bone continued to request pain medication, he was continually directed to purchase OTC pain relievers. He continued to disregard this recommendation and became aggressive when addressing medical staff. Once he did finally purchase OTC medication, staff prescribed a round of prednisone and Ibuprofen; however, it became clear he was not taking the medication when a cell search on January 24, 2019 resulted in nine prednisone and eighteen Ibuprofen tablets being confiscated from Bone's cell.

Dr. Edinger provided a splint to Bone on February 1, 2019 and advised him to wear it continuously for six weeks. However, staff noted as of the end of that month that Bone had yet to be observed wearing the splint throughout the day. At the latest encounter concerning his wrist pain, staff noted Bone had been in restraints a number of times for engaging in disruptive behavior, failing to give sufficient time for the nerve injury to heal. Staff advised him to continue OTC medication and avoid behavior placing him in restraints. Plaintiff, himself, admits that he has been provided medical treatment. To the extent that he attempts to argue that medical never addressed his panic attacks or anxiety, the record is devoid of any medical encounter in which

Plaintiff addressed these issues with Dr. Edinger or PA Ayers and was refused treatment.

At best, Plaintiff's complaint demonstrates his disagreement with the type of treatment rendered, specifically, his disagreement with the medical professionals at USP-Lewisburg with respect to his need for medications, as the record clearly reveals that his medical encounters have clearly been efforts to seek medication without a medically necessary foundation. Though he may have disagreed with the medical department's assessment that psychotropic medication was not medically necessary, his disagreement with the course of action that was taken is not enough to state a §1983 claim. Sample v. Diecks, 885 F.2d 1099, 1109 (3d Cir. 1989) (citing Estelle, 429 U.S. at 105-06 (in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind)). This is particularly so in light of the fact that there are no allegations in the complaint that any of the Defendants intentionally withheld medical treatment from Plaintiff in order to inflict pain or harm upon Plaintiff. Farmer, 511 U.S. at 837; Rouse, 12 F.3d at 197. To that extent, the record demonstrates that Plaintiff has been psychologically assessed on numerous occasions by several different treating psychologists, shows that Defendants continue to be attentive to Plaintiff's situation.

- 34 -

Thus, the Plaintiff's complaint amounts to nothing more than Plaintiff's subjective disagreement with the treatment decisions and medical judgment of the USP-Lewisburg Medical Department. Where, as here, an inmate is provided with medical care and the dispute is over the adequacy of that care, an Eighth Amendment claim does not exist. Nottingham v. Peoria, 709 F. Supp. 542, 547 (M.D. Pa. 1988). Defendants' motion for summary judgment will be granted.

### E. **Personal Involvement of Ebbert and Colbert**

A plaintiff, in order to state an actionable civil rights claim, must plead two essential elements: (1) that the conduct complained of was committed by a person acting under color of law, and (2) that said conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. See Groman v. Township of Manalapan, 47 F.3d 628, 638 (3d Cir. 1995); Shaw by Strain v. Strackhouse, 920 F.2d 1135, 1141-42 (3d Cir. 1990).

Furthermore, federal civil rights claims brought under §1983 cannot be premised on a theory of *respondeat superior*. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). Rather, each named defendant must be shown, via the complaint's allegations, to have been personally involved in the events or occurrences which underlie a claim. See Rizzo v. Goode, 423 U.S.

- 35 -

362 (1976); Hampton v. Holmesburg Prison Officials, 546 F.2d 1077 (3d Cir. 1976). As explained in Rode:

> A defendant in a civil rights action must have personal involvement in the alleged wrongs.... [P]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity.

Rode, 845 F.2d at 1207.

Inmates also do not have a constitutional right to a prison grievance system. See Jones v. North Carolina Prisoners Labor Union, 433 U.S. 119, 137-138 (1977); Speight v. Sims, No. 08-2038, 2008 WL 2600723 at *1 (3d. Cir. Jun 30, 2008)(citing Massey v. Helman, 259 F.3d 641, 647 (7th Cir. 2001)("[T]he existence of a prison grievance procedure confers no liberty interest on a prisoner.")). Consequently, any attempt by Plaintiff to establish liability against a defendant solely based upon the substance or lack of response to his institutional grievances does not by itself support a constitutional due process claim. See also Alexander v. Gennarini, 144 Fed. Appx. 924, 925 (3d Cir. 2005)(involvement in post-incident grievance process not a basis for §1983 liability); Prvor-El v. Kelly, 892 F. Supp. 261, 275 (D. D.C. 1995) (because prison grievance procedure does not confer any substantive constitutional rights upon prison inmates, the prison officials' failure to comply with grievance procedure is not actionable).

With respect to Defendants Warden Ebbert and Deputy Warden Colbert, Plaintiff contends that he submitted grievances to these Defendants regarding "being denied medical and psychological treatment and medication." (Doc. 25).

Based on those vague assertions and the record which reveals the only involvement of these Defendants were through their involvement with Plaintiff's grievances, it is apparent that Plaintiff is attempting to establish liability against these Defendants based upon either their respective supervisory capacities or their review of his institutional grievances. Pursuant to the above discussion, either approach is insufficient for establishing civil rights liability against those Defendants and they are entitled to judgment as a matter of law.

## V. **Preliminary Injunction**

An injunction is an "extraordinary remedy" that is never awarded as of right. Winter v. Natural Resources Defense Council, 555 U.S. 7 (2008).

The United States Court of Appeals for the Third Circuit has delineated four (4) factors that a district court must consider when ruling on a motion for a preliminary injunction: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured if the court denies the requested relief; (3) whether

granting the requested relief will result in even greater harm to the nonmoving party; and (4) whether granting the relief will be in the public interest. See Gerardi v. Pellulo, 16 F.3d 1363, 1373 (3d Cir. 1994); Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 1970–98 (3d Cir. 1990). These same factors are used in considering a motion for temporary restraining order. Bieros v. Nicola, 857 F.Supp. 445, 446 (E.D. Pa. 1994). The moving party has the burden of satisfying these factors. Adams v. Freedom Forge Corp., 204 F.3d 475, 486 (3d Cir. 2000). While each factor need not be established beyond a reasonable doubt, they must combine to show the immediate necessity of injunctive relief. Stilp v. Contino, 629 F.Supp.2d 449, 457 (M.D. Pa. 2009) (citing Swartzwelder v. McNeilly, 297 F.3d 228, 234 (3d Cir. 2002) ). In addition, "[a]s these elements suggest, there must be a 'relationship between the injury claimed in the party's motion and the conduct asserted in the complaint'." Ball v. Famiglio, 396 Fed. App'x 836, 837 (3d Cir. 2010) (quoting Devose v. Herrington, 42 F.3d 470, 471 (8th Cir. 1994) ).

Moreover, the power of a court to issue injunctive relief is also limited and circumscribed by the mootness doctrine. The mootness doctrine recognizes a fundamental truth in litigation: "[i]f developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested

relief, the case must be dismissed as moot." Blanciak v. Allegheny Ludlum Corp., 77 F.3d 690, 698–99 (3d Cir. 1996).

In the instant case, Bone seeks injunctive relief in the form of Court ordered "treatment and medication." (Doc. 25). However, Bone is no longer housed at USP-Lewisburg. Subsequent to the filing of the above captioned action, Plaintiff was transferred to USP-Coleman.

The Third Circuit Court of Appeals has observed that, when addressing inmate requests for injunctive relief:

> As a preliminary matter, we must determine whether the inmates' claims are moot because "a federal court has neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them." Preiser v. Newkirk, 422 U.S. 395, 401 (1975) (quotations omitted); see also, Abdul–Akbar v. Watson, 4 F.3d 195, 206 (3d Cir. 1993). An inmate's transfer from the facility complained of generally moots the equitable and declaratory claims. Abdul–Akbar, 4 F.3d at 197 (former inmate's claim that the prison library's legal resources were constitutionally inadequate was moot because plaintiff was released five months before trial.)

Sutton v. Rasheed, 323 F.3d 236, 248 (3d Cir. 2003). This Court has previously held, in a case such as the present, where an inmate seeks injunctive relief against his jailers but is no longer housed at the prison where those injunctive claims arose, his transfer to another institution moots any claims for injunctive or declaratory relief. Fortes v. Harding, 19 F.Supp.2d 323, 326 (M.D. Pa. 1998). For these reasons, Plaintiff's claim for preliminary injunctive relief must be denied as moot since he is no longer confined at

USP-Lewisburg, and there is no indication that he will be housed at that facility in the foreseeable future.

## VI. **Conclusion**

Based upon the undisputed facts of record, Defendants' motion to dismiss and for summary judgment will be granted.

An appropriate order shall issue.

*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Dated: March 29, 2022**

19-0112-01

- 40 -